NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11981

COMMONWEALTH  vs.  ADMILSON RESENDE.


Plymouth.     April 4, 2016. - July 25, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Controlled Substances.  Constitutional Law, Plea, Conduct of
     government agents.  Due Process of Law, Plea, Disclosure of
     evidence, Presumption.  Practice, Criminal, Plea, New
     trial, Conduct of government agents, Disclosure of
     evidence, Presumptions and burden of proof.  Evidence,
     Guilty plea, Certificate of drug analysis, Presumptions,
     Disclosure of evidence.



Indictments found and returned in the Superior Court
Department on November 9, 2006.

A motion to withdraw a guilty plea, filed on October 2,
2012, and supplemented on March 20, 2014, was heard by Paul A.
Chernoff, J., special judicial magistrate, and an order
affirming the proposed order of the special judicial magistrate
was entered by Frank M. Gaziano, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Patrick Levin, Committee for Public Counsel Services, for
the defendant.

     Laurie Yeshulas, Assistant District Attorney (Lisa J.
Jacobs, Assistant District Attorney, with her) for the
Commonwealth.


     SPINA, J.  The present case is the most recent in a series
of cases concerning the egregious misconduct of Annie Dookhan, a
chemist who was employed in the forensic drug laboratory of the
William A. Hinton State Laboratory Institute (Hinton drug lab)
from 2003 until 2012.  On January 23, 2007, the defendant,
Admilson Resende, pleaded guilty on indictments charging
distribution of a class B controlled substance (cocaine), G. L.
c. 94C, § 32A (c) (five counts); violation of the controlled
substances laws in proximity to a school or park, G. L. c. 94C,
§ 32J (three counts); and possession of a class B controlled
substance (cocaine) with intent to distribute, G. L. c. 94C,
§ 32A (c) (one count).[1]  He completed service of his sentences.[2]
On October 2, 2012, the defendant filed in the Superior Court a
motion to withdraw his guilty pleas pursuant to Mass. R. Crim.

---

     [1] An indictment charging unlawful possession of a class D
controlled substance (marijuana), G. L. c. 94C, § 34, as amended
through St. 1996, c. 271, § 1, was placed on file.

     [2] With respect to the indictments charging distribution of
cocaine and possession of cocaine with intent to distribute, the
defendant was sentenced to concurrent terms of a mandatory
minimum sentence of one year in a house of correction.  G. L.
c. 94C, § 32A (c), as amended through St. 1991, c. 391.  With
respect to the school or park zone charges, the defendant was
sentenced to concurrent terms of a mandatory minimum sentence of
two years in a house of correction, to commence on and after the
completion of his sentences for the underlying drug crimes.
G. L. c. 94C, § 32J, as amended through St. 1998, c. 194, § 146.

P. 30, as appearing in 435 Mass. 1501 (2001), based on Dookhan's malfeasance.

Prior to the issuance of a ruling on the defendant's motion, this court decided Commonwealth v. Scott, 467 Mass. 336 (2014), in which we articulated, in reliance on Ferrara v. United States, 456 F.3d 278, 290-297 (1st Cir. 2006), a two-prong framework for analyzing a defendant's motion to withdraw a guilty plea under rule 30 (b) in a case involving the misconduct of Dookhan at the Hinton drug lab. Scott, supra at 346-358. Under the first prong of the analysis, a defendant must show egregious misconduct by the government that preceded the entry of the defendant's guilty plea and that occurred in the defendant's case. Id. at 347-354. We recognized that, given the breadth and duration of Dookhan's malfeasance, it might be impossible for a defendant to show the required nexus between government misconduct and the defendant's own case. Id. at 351-352. Consequently, we established a special evidentiary rule whereby a defendant seeking to vacate a guilty plea under rule 30 (b) as a result of the revelation of Dookhan's misconduct, and proffering a certificate of drug analysis (drug certificate) from the defendant's case signed by Dookhan on the line labeled "Assistant Analyst," would be entitled to "a conclusive presumption that egregious government misconduct occurred in the defendant's case." Id. at 352. Application of this conclusive

presumption in a particular case meant that a defendant's evidentiary burden to establish each element of the first prong of the Ferrara-Scott framework was satisfied. Id. at 353-354. The defendant then had the burden under the second prong of the analysis of particularizing Dookhan's misconduct to his or her decision to tender a guilty plea. Id. at 354-355. That is to say, the defendant had to "demonstrate a reasonable probability that he [or she] would not have pleaded guilty had he [or she] known of Dookhan's misconduct." Id. at 355. A successful showing on this second prong of the Ferrara-Scott framework would warrant an order granting the defendant's motion to withdraw a guilty plea.

In light of our decision in Scott, as well as new evidence concerning the Hinton drug lab's analyses of the samples in his case,[3] the defendant filed supplemental pleadings on March 20, 2014, in support of his motion to withdraw his guilty pleas. He pointed out that Dookhan had set up and operated the gas chromatography-mass spectrometry (GC-MS) machine for three out

---

[3] On April 1, 2013, defense counsel filed a motion in the Superior Court for the production of documentation from the forensic drug laboratory of the William A. Hinton State Laboratory Institute (Hinton drug lab) that supported the results set forth on each certificate of drug analysis (drug certificate) in the defendant's case. Counsel sought, in particular, the reviewable data produced by the gas chromatography-mass spectrometry (GC-MS) machine that had performed the drug analyses. The motion was allowed, and the office of the Inspector General produced the requested documentation.

of the seven samples in his case (although her name did not appear on those drug certificates), and that she had been the confirmatory chemist for a fourth sample.  As a consequence, the defendant asserted that, with respect to these four samples, he was entitled to the conclusive presumption articulated in Scott, 467 Mass. at 352, that egregious government misconduct occurred in his case.  He further argued that he would not have pleaded guilty had he known of Dookhan's misconduct at the time of his pleas.

Following an evidentiary hearing, a special magistrate appointed by the Chief Justice of the Superior Court Department of the Trial Court pursuant to Mass. R. Crim. P. 47, 378 Mass. 923 (1979), denied the defendant's motion to withdraw his guilty pleas.  See Commonwealth v. Charles, 466 Mass. 63, 89-90 (2013) (describing authority of special magistrate to conduct guilty plea colloquies in Hinton drug lab sessions).  The defendant appealed the special magistrate's proposed order dated May 12, 2014, to the Regional Administrative Justice of the Superior Court, who denied the defendant's appeal and affirmed the decision of the special magistrate.  See id. at 66, 90-91.  The defendant filed a timely notice of appeal in the Appeals Court, and we subsequently granted his application for direct appellate review.  For the reasons that follow, we conclude that the defendant was not entitled to the conclusive presumption that

egregious government misconduct occurred in his case, and that his motion to withdraw his guilty pleas was properly denied.[4]

1.  Background.  On four divers dates in August, 2006, Detective Timothy Stanton of the Brockton police department conducted "controlled buys" of what appeared to be cocaine from the defendant.  Each purchase occurred in a similar manner.  Stanton would telephone a number that had been provided by the defendant and would meet him (or, on the first occasion, a female associate) at a designated location in the "Village" section of Brockton.  Each of these locations was within 1,000 feet of an elementary school or a park.  Stanton would purchase two "twenty" bags of an off-white rock-like substance from the defendant for forty dollars.  Before and after several of these controlled buys, the defendant was observed leaving and reentering a multifamily home on North Montello Street.  Field tests conducted on the substances indicated the presumptive presence of cocaine.  Based on these controlled buys, Stanton applied for and was granted a search warrant for the defendant's residence on the first floor of the North Montello Street address.

---

[4] Although our recent decision in Commonwealth v. Resende, 474 Mass. 455 (2016), concerned the same defendant as in the present case, the issues raised in the two cases are entirely different.

On August 22, 2006, Stanton engaged in a fifth controlled buy with the intention of executing the search warrant immediately thereafter. He telephoned the defendant, who directed him to the corner of North Montello Street and King Avenue and advised him that he would have one "forty" bag instead of two "twenty" bags. When Stanton arrived at the meeting place, he telephoned the defendant and subsequently observed him leaving the residence on North Montello Street. Stanton gave the defendant two twenty dollar bills with prerecorded serial numbers in exchange for a clear plastic bag containing an off-white rock-like substance. A team of police officers then secured the defendant and took him into custody. The defendant was advised of the Miranda rights and acknowledged that he understood those rights. Found on the defendant's person were a Nextel cellular telephone (on which Stanton's telephone call was still visible), three pieces of an off-white rock-like substance wrapped in clear plastic, a bag containing green vegetable matter, and two twenty dollar bills having the prerecorded serial numbers.

The substances recovered from the five controlled buys and from the defendant's person were sent to the Hinton drug lab for analysis. Seven drug certificates were issued. As relevant to the present appeal, three of the drug certificates, stating that the substances seized from the defendant contained cocaine as

defined in G. L. c. 94C, § 31, were signed on the line labeled "Assistant Analysts" by Daniela Frasca and Michael Lawler. However, as will be explained in greater detail infra, Dookhan was the so-called "setup operator" for the substances (samples 779099, 779110, and 779125) that were analyzed to generate these certificates. A fourth drug certificate, stating that the substance (sample 810059) seized from the defendant contained cocaine as defined in G. L. c. 94C, § 31, was signed on the line labeled "Assistant Analysts" by Frasca and Dookhan.[5]

In 2012, Dookhan admitted to tampering with evidence at the Hinton drug lab, failing to comply with quality control measures, forging the initials of an evidence officer, and "dry labbing."[6] See Scott, 467 Mass. at 339-340. It appeared that "the motive for her wrongdoing was in large part a desire to increase her apparent productivity." Id. at 341. Following a

---

[5] Two of the remaining drug certificates, stating that the substances (samples 810300 and 810301) seized from the defendant contained cocaine as defined in G. L. c. 94C, § 31, were signed on the line labeled "Assistant Analysts" by Kate Corbett and Della Saunders. The final drug certificate, stating that the substance (sample 810302) seized from the defendant contained marijuana as defined in G. L. c. 94C, § 31, was signed on the line labeled "Assistant Analyst" by Saunders. Because there is no evidence that Dookhan was involved in the analyses of the substances for which these three drug certificates were generated, we do not consider them further.

[6] Dookhan's admission to "dry labbing" meant that "she would group multiple samples together from various cases that looked alike and then test only a few samples, but report the results as if she had tested each sample individually." Commonwealth v. Scott, 467 Mass. 336, 339 (2014).

criminal investigation into Dookhan's misconduct, the Attorney General's office indicted her on twenty-seven charges -- seventeen counts of tampering with evidence, eight counts of obstruction of justice, one count of perjury, and one count of falsely claiming to hold a degree from a college or university. See id. at 337 & n.3.  On November 22, 2013, Dookhan pleaded guilty to all of the charges.  See id.  She was sentenced to from three years to five years in the State prison, followed by a probationary term of two years.

2.  Testing procedures at the Hinton drug lab.  At the April 22, 2014, hearing before the special magistrate on the defendant's motion to withdraw his guilty pleas, the parties presented, among other evidence, a report from the office of the Inspector General (report), dated March 4, 2014, describing its comprehensive investigation of the operation and management of the Hinton drug lab from 2002 to 2012.[7]  In addition, the defendant presented the testimony of Michael Lawler, the confirmatory chemist for samples 779099, 779110, and 779125, with respect to which Dookhan was the setup operator.[8]  Lawler,

---

[7] The report was issued one day before the release of our opinion in Scott and greatly enhanced public understanding of the details surrounding Dookhan's misconduct at the Hinton drug lab.

[8] On November 4, 2014, the defendant filed a motion to reconstruct the testimony given by Lawler at the hearing on the defendant's motion to withdraw his guilty pleas.  Due to an

whom the special magistrate found to be credible, described the GC-MS machine, as well as the duties and responsibilities of a primary chemist, a confirmatory chemist, and a setup operator.

When a law enforcement agency brought a substance to the Hinton drug lab for analysis, an evidence officer would accept the substance and assign it a sample number, which would be attached to the substance through all of the phases of the testing process.  The evidence officer would create a drug receipt, which included the sample number, and would give a copy of the receipt to the law enforcement agency that had requested the analysis.  Then, the evidence officer would generate a control card[9] and place it, together with the substance, in a manila envelope labeled with the sample number.  Eventually, the substance would be assigned to a chemist for analysis.

The special magistrate described the testing process used by the Hinton drug lab as a "two-phase system," rather than a

_____

equipment malfunction, a transcript of that hearing could not be produced.  The parties subsequently filed a joint statement regarding their recollections of Lawler's testimony, and the special magistrate accepted the statement.

[9] The control card would list information about the sample, including its number, its net weight, the identity of the primary and confirmatory chemists assigned to the sample, and the analytical results.  The control card stayed with the sample throughout the testing process.

"two-chemist system."[10]  During the preliminary phase, substances submitted by law enforcement agencies for analysis were assigned to a primary chemist.  That individual would be responsible for weighing the samples and conducting preliminary bench tests, which included color, microcrystalline, gas chromatography, infrared spectroscopy, ultraviolet spectroscopy, macroscopic, and microscopic tests.  The primary chemist would document the test results and make preliminary determinations as to the identities of the samples.  Then, the primary chemist would prepare the samples for the confirmatory testing process by making aliquots[11] for analysis by the GC-MS machine.  In addition, the primary chemist would complete a GC-MS control sheet, setting forth the date, the identity of the primary chemist, the name of the submitting law enforcement agency, a list of samples in numerical order, the chemist's preliminary

---

[10] The special magistrate found that under a "two-chemist system," the primary chemist conducted the preliminary bench tests, and the confirmatory chemist received the samples for analysis by the GC-MS machine, operated the GC-MS machine, and confirmed the preliminary findings made by the primary chemist. In contrast, under a "two-phase system," one chemist was responsible for the preliminary testing phase, and one or two different chemists were responsible for the confirmatory phase (except in rare instances when a single chemist completed both phases).  When performing the confirmatory phase, one chemist would receive the samples and operate the GC-MS machine, and a different chemist would analyze the results generated by the GC-MS machine.

[11] An aliquot is a small portion of the sample that the primary chemist places into a glass vial and dissolves with a solvent.

findings, and any comments that would be helpful to the confirmatory chemist in the subsequent analysis. Finally, the primary chemist would take the GC-MS control sheet, the control card, and the aliquots to the room where the GC-MS machines were located (GC-MS room) so that the confirmatory phase of the testing process could begin.

With respect to the confirmatory testing process, the Hinton drug lab generally followed the protocol recommended by the Scientific Working Group for the Analysis of Seized Drugs, which relied on use of a GC-MS machine. The GC-MS room was situated in the middle of the laboratory complex and was accessible by only one door. Each machine was a large, box-shaped piece of equipment with a robotic arm that had a syringe attached to the end of it. Placed inside the GC-MS machine was a carousel which could be loaded with 100 to 120 vials, depending on the size of the machine. When operational, the carousel would move the vials toward the syringe which would puncture the top of each vial to commence the testing process for that sample. After the contents of a vial were analyzed, the GC-MS machine automatically purged the syringe by "spitting" its contents into a waste receptacle and then putting the syringe into a cleaning solution.

The confirmatory phase involved three separate steps -- receipt of the samples in the GC-MS room, operation of the GC-MS

machine, and analysis of the results from the GC-MS machine to confirm the preliminary identification of the samples. It was common practice at the Hinton drug lab for the setup operator to complete the first two steps, and for the confirmatory chemist, who signed the drug certificates, to complete the last step.[12] Chemists were assigned to work as the setup operator for week-long shifts. Although the setup operator had some level of autonomy because he or she was not directly supervised, a supervisor usually was present in the GC-MS room. On some occasions, the setup operator would become the confirmatory chemist and would analyze the results produced by the GC-MS machine. On other occasions, the GC-MS machine would run overnight, so the setup operator might not be the chemist who would interpret the results the following morning and sign the drug certificates.

At the beginning of the confirmatory phase, the setup operator would receive the aliquots from the primary chemist and verify that the number on each vial matched the sample numbers on the accompanying GC-MS control sheet and control card. The setup operator would inspect the vials and document any problems, including signs of contamination. Then, he or she

---

[12] According to the special magistrate's findings and the report from the office of the Inspector General, chemists at the Hinton drug lab did not consider it to be a requirement that one chemist perform all three steps of the confirmatory phase of the testing process.

would place the aliquots, along with vials containing standards,[13] blanks,[14] and a quality control standard mix,[15] on the carousel of the GC-MS machine for analysis.  The setup operator would complete a "sequence" or "batch" sheet, an internal document that specified the order in which the various vials were arranged on the carousel, and enter the information from the sheet into the GC-MS machine.  The setup operator would not open the aliquots.

Before the aliquots could be analyzed, the setup operator was required to confirm that the GC-MS machine was ready for operation.  This involved "tuning" the GC-MS machine to ensure that it was operating within acceptable parameters, ascertaining that the GC-MS machine correctly identified the quality control standard mix, and confirming that tests on the first few vials

---

[13] A standard was a known controlled substance against which the aliquots were compared.  In the present case, the standard was cocaine.  The aliquots being analyzed were bracketed by standards to ensure that the GC-MS machine was operating properly at the beginning, middle, and end of the testing sequence.  If the setup operator noticed that the GC-MS machine had not identified the standard correctly, the "run" of the assorted vials would be terminated, and another run would be prepared using a new standard.

[14] Blanks typically consisted of the solvent that had been used to dissolve the aliquots.  They were inserted on the carousel between the aliquots and the standards, and were used to ensure that there was no contamination during the testing process.

[15] The quality control standard mix was a combination of cocaine and codeine.  It was used to ensure that the GC-MS machine was operating properly.

containing standards and blanks also correctly identified those substances.  In addition, the setup operator was responsible for other quality control measures, including ensuring that the standards were not contaminated, emptying the waste receptacle, lubricating the syringe, and replacing the injection seal, as necessary.[16]  If at any time the setup operator determined that the GC-MS machine was not fit for operation, the operator would terminate the "run" of a batch of vials and restart the analysis process.

The GC-MS machine would produce reviewable data that the chemists referred to as "documentation."  Once the GC-MS machine had completed its analysis of the aliquots, the confirmatory chemist would check the placement of the vials against the sequence sheet to ensure that they were tested in the correct order.  The confirmatory chemist then would analyze the documentation and identify each sample without using the primary chemist's notes.  This identification would be added to the front of the GC-MS control sheet and the control card.  A sample would have to test positive in both the preliminary and confirmatory phases in order to be conclusively identified as the controlled substance at issue.  Finally, the primary and confirmatory chemists would sign the drug certificates.  If

---

[16] The location and purpose of the injection seal are unclear from the record.

there was an inconsistency between the identification made by the primary chemist and that made by the confirmatory chemist, the samples would be returned to the primary chemist for further analysis or for the preparation of new aliquots.

3.  Testing in the defendant's case.  As to samples 779099, 779110, and 779125, Lawler testified that Daniela Frasca was the primary chemist, Dookhan was the setup operator, and he was the confirmatory chemist.  Frasca conducted the bench tests, prepared the aliquots for analysis by the GC-MS machine, and preliminarily identified the three samples as cocaine.  Dookhan then placed the assorted vials on the carousel of the GC-MS machine on Friday, October 6, 2006, and entered the sequence of their arrangement into the machine.  She initiated the analysis process that morning, it continued throughout the night, and it was finished the following morning, Saturday, October 7.  Lawler testified that Dookhan would have been responsible for performing any necessary quality control measures, and for ensuring that the GC-MS machine was operating properly prior to the run.  Once the analysis was completed on Saturday morning, Lawler reviewed the performance of and documentation from the GC-MS machine.  He testified that he would have checked the GC-MS machine and would have examined the placement of the vials before he removed them from the carousel.  Based on his review of the documentation, Lawler confirmed that samples 779099,

779110, and 779125 contained cocaine, and he signed the drug certificates.[17]

Lawler testified that although he had some concerns about Dookhan based on her productivity as a primary chemist, he did not have similar concerns regarding her work in the GC-MS room. Lawler stated that confirmatory testing on the GC-MS machine was "very static," meaning that it was not possible to increase or accelerate the process, and that it did not involve any "creativity." When asked how a "rogue" person could influence the results of the GC-MS machine, Lawler testified that he did not see how it could be done without detection.

4. Decision of the special magistrate. In a thorough and well-reasoned memorandum of decision denying the defendant's motion to withdraw his guilty pleas, the special magistrate pointed out that Scott does not address whether the conclusive presumption of egregious government misconduct is available to a defendant in a case where Dookhan merely was the setup operator and did not sign the drug certificates. The special magistrate found that the roles of setup operator and confirmatory chemist, while overlapping, were not so closely analogous or interchangeable that they should be treated as one, and that the language in Scott clearly limits the conclusive presumption to

---

[17] With respect to sample 810059, Dookhan signed the drug certificate on the line labeled "Assistant Analysts," certifying that the sample contained cocaine.

those cases where Dookhan was the primary or confirmatory chemist.  Accordingly, he declined to expand the scope of Scott such that the defendant would be entitled to a conclusive presumption that egregious government misconduct occurred with respect to the analyses of samples 779099, 779110, and 779125.

The special magistrate then considered whether, absent the conclusive presumption, the defendant nonetheless had demonstrated that Dookhan, while acting as the setup operator, had engaged in "particularly pernicious" misconduct, and that such misconduct was material to the defendant's decision to plead guilty.  See Scott, 467 Mass. at 346-348, 354-355, citing Ferrara, 456 F.3d at 290, 291.  The special magistrate found that there was no evidence that Dookhan had acted with purposeful malfeasance while serving as the setup operator for samples 779099, 779110, and 779125.  To the contrary, he continued, the evidence indicated that Dookhan had performed her duties as would have been expected.  That being the case, the special magistrate concluded that the defendant had failed to satisfy his burden of proof with respect to the first prong of the Ferrara-Scott framework.  Turning to the second prong of the framework, the special magistrate also concluded that the defendant had not demonstrated a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct.  He found that the factual bases for the defendant's

guilty pleas were not substantially weakened by Dookhan's purported misconduct in this case, and that the defendant's sentences after pleading guilty were considerably more favorable than the sentences that could have been imposed if he had proceeded to trial.

Finally, with respect to sample 810059, the special magistrate stated that because Dookhan was the confirmatory chemist, the defendant was entitled to the conclusive presumption articulated in Scott that egregious government misconduct occurred with respect to the analysis of this particular sample. However, he concluded that, for essentially the same reasons he already had articulated, the defendant had failed to satisfy his burden of proof under the second prong of the Ferrara-Scott framework. Accordingly, the special magistrate denied the defendant's motion to withdraw his guilty pleas.

5. Standard of review. A motion to withdraw a guilty plea is treated as a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b). Commonwealth v. Furr, 454 Mass. 101, 106 (2009). "Under Mass. R. Crim. P. 30 (b), a judge may grant a motion for a new trial any time it appears that justice may not have been done. A motion for a new trial is thus committed to the sound discretion of the judge." Scott, 467 Mass. at 344. We review the allowance or denial of a motion to withdraw a

guilty plea to determine whether the judge abused that discretion or committed a significant error of law. Id. We accept the judge's findings of fact if they are supported by the evidence because the judge who heard the witnesses testify is the "final arbiter [on] matters of credibility." Id., quoting Commonwealth v. Schand, 420 Mass. 783, 787 (1995).

6. Egregious misconduct by the government in the defendant's case. The defendant first contends that, although Dookhan did not sign the drug certificates pertaining to samples 779099, 779110, and 779125, she nonetheless effectively acted as a confirmatory chemist for those samples because she tuned the GC-MS machine, verified that it was functioning properly, placed the vials on the carousel, and initiated the analysis process. The defendant points out that Dookhan's admitted misconduct while serving as a confirmatory chemist included the failure to verify the proper functioning of a GC-MS machine and the falsification of reports to hide her wrongdoing. See Scott, 467 Mass. at 339-341, 353 n.9. In light of this malfeasance, the defendant argues that he was entitled to the conclusive presumption articulated in Scott, 467 Mass. at 352, that egregious government misconduct occurred in his case. We disagree.

We stated in Scott, supra at 339-341, 353 n.9, that Dookhan appeared to have engaged in misconduct during the confirmatory

phase of the analysis process at the Hinton drug lab. However, the present case is not one in which Dookhan was performing the dual roles of setup operator and confirmatory chemist with respect to samples 779099, 779110, and 779125. Contrary to the defendant's assertions, Dookhan's work as the setup operator did not involve the "testing" of drugs. Testing was performed first by the primary chemist (Frasca), who completed bench tests and made a preliminary identification of each sample based on her subjective interpretation of the results, and then by the GC-MS machine, which produced documentation that was reviewed and interpreted by the confirmatory chemist (Lawler). Notably, Dookhan did not prepare the aliquots for analysis by the GC-MS machine because that task was the responsibility of Frasca. Dookhan's role was simply to receive the aliquots, prepare the GC-MS machine, and initiate the analysis process. Once the analysis process had been completed, Lawler checked the GC-MS machine, verified the proper placement of the vials on the carousel, and reviewed the documentation. If there had been any inconsistency between the identification made by Frasca and that made by Lawler, the samples would have been returned to Frasca for further analysis or for the preparation of new aliquots. In the opinion of Lawler, whom the special magistrate found to be credible, tampering with the GC-MS machine would have been detectable.

Significantly, the office of the Inspector General found no evidence that Dookhan tampered with drug samples that were assigned to other chemists, such as Frasca and Lawler in the present case.  When Dookhan tampered with her own samples, it appeared that she was motivated, in large part, by her desire to increase her apparent productivity.  See Scott, 467 Mass. at 341, 352.  Given that there was no way to increase or accelerate the analysis process on a GC-MS machine, Dookhan would have had no reason to tinker with its operation while serving as the setup operator.  Any such tinkering would not have enhanced her productivity.  Indeed, based on its comprehensive investigation of the Hinton drug lab from 2002 to 2012, the office of the Inspector General did not suggest treating with increased suspicion those cases where Dookhan served as the setup operator.  We conclude that the special magistrate did not abuse his discretion or otherwise err in determining that the defendant was not entitled to the conclusive presumption articulated in Scott, supra at 352, that egregious government misconduct occurred in his case with respect to the analyses of samples 779099, 779110, and 779125.[18]

---

[18] Given that Dookhan signed the drug certificate for sample 810059 on the line labeled "Assistant Analysts," the special magistrate properly concluded that the defendant was entitled to the conclusive presumption that egregious government misconduct occurred with respect to the analysis of this particular sample.

Absent this conclusive presumption, a defendant who moves to withdraw his guilty pleas has the evidentiary burden of establishing, as an initial matter, each element of the first prong of the Ferrara-Scott framework.  See Ferrara, 456 F.3d at 290; Scott, 467 Mass. at 346-354.  Here, the defendant was required to show that Dookhan engaged in "egregiously impermissible conduct" in his case, and that such misconduct preceded the entry of his guilty pleas.[19]  Ferrara, supra.  See Scott, supra.  Based on the report, the timing and the scope of Dookhan's misconduct during the confirmatory phase of the analysis process at the Hinton drug lab do not suggest that she engaged in malfeasance with respect to samples 779099, 779110, and 779125, which were analyzed in October, 2006.

First, the report found that around March, 2011, chemist Kate Corbett reported to the supervisor of the GC-MS room that Dookhan had forged her initials on a batch sheet, falsely indicating that Corbett had been the operator of the GC-MS machine for the particular run of samples indicated on the sheet.  Apart from the fact that this incident occurred nearly four and one-half years after the defendant's samples were analyzed, there was no evidence to suggest that Dookhan had

---

[19] It is well established that Dookhan's work at the Hinton drug lab, including her service as the setup operator for samples 779099, 779110, and 779125, was conduct "by the government."  Scott, 467 Mass. at 348-350.

tampered with the actual operation of the GC-MS machine, notwithstanding her forgery of Corbett's initials on the batch sheet. Next, the report found that between May 10, 2011, and May 14, 2011, Dookhan falsified four days of reports pertaining to the quality control standard mix runs on the GC-MS machine. See note 15, supra. Dookhan completed these reports as if the GC-MS machine had performed satisfactorily, when it had not, and then she signed the reports as the "quality control reviewer," thereby approving her own falsified test results.[20] After discovering this misconduct, the office of the Inspector General reviewed 3,930 quality control standard mix results from 2005 to 2012. It did not find any additional falsified reports or evidence of other wrongdoing with respect to the quality control standard mixes. Finally, the report found that in June, 2011, Dookhan forged the initials of chemist Nicole Medina on a so-called "tune report." During the course of its comprehensive investigation, the OIG reviewed tune reports from 2009 to 2012. It did not find any reports indicating that the GC-MS machines were operating outside acceptable parameters. We conclude that

---

[20] According to the report, the job of the "quality control reviewer" was "to collect the quality control record from the chemists and various areas of the lab, ensure that the chemists had filled in the records, sign them, and present them" to the "quality assurance reviewers." The signature of the "quality control reviewer" documented that "the reviewer had looked at a list of checkmarks on a completed form created by a chemist indicating he or she had performed one of the necessary quality control tasks."

the defendant did not establish that Dookhan engaged in egregious misconduct while serving as the setup operator for samples 779099, 779110, and 779125.  Accordingly, the special magistrate properly determined that the defendant could not withdraw his guilty pleas where he failed to satisfy each element of the first prong of the Ferrara-Scott framework.

As discussed, the analysis of a defendant's motion to withdraw a guilty plea under Mass. R. Crim. P. 30 (b) in a case involving the misconduct of Dookhan at the Hinton drug lab proceeds under a two-prong framework.  See Scott, 467 Mass. at 346-358, citing Ferrara, 456 F.3d at 290, 291.  Given our conclusion that the defendant here has failed to satisfy the first prong of the framework with respect to the testing of samples 779099, 779110, and 779125, we need not further consider whether, under the second prong, the defendant demonstrated "a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct."  Scott, supra at 355.  See Ferrara, supra at 290, 294.  However, the second prong is relevant with respect to sample 810059 because the drug certificate pertaining to that one sample, stating that it contained cocaine as defined in G. L. c. 94C, § 31, was signed on the line labeled "Assistant Analysts" by Frasca and Dookhan.  As to that one sample, the defendant was deemed to have satisfied each element of the first prong of the Ferrara-Scott

framework.  See Scott, supra at 353-354.  We therefore proceed to consider the second prong as it relates to sample 810059.[21]

7.  Material influence on the defendant's decision to plead guilty.  Under the second prong of the Ferrara-Scott framework, the defendant had the burden of particularizing "Dookhan's misconduct to his decision to tender a guilty plea."  See Scott, 467 Mass. at 354.  That is to say, the defendant had to demonstrate, based on a totality of the circumstances, "a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct."  Id. at 355.  In reliance on Ferrara, 456 F.3d at 294, this court identified in Scott a number of factors that could be relevant to a defendant's showing under this second prong, including "(1) whether evidence of the government misconduct could have detracted from the factual basis used to support the guilty plea, (2) whether the evidence could have been used to impeach a witness whose credibility may have been outcome-determinative, (3) whether the evidence was cumulative of other evidence already in the defendant's possession, (4) whether the evidence would have influenced counsel's recommendation as to whether to accept a particular plea offer, and (5) whether the value of the evidence was outweighed by the benefits of entering into the plea

_____

[21] Sample 810059 pertained to indictments charging distribution of cocaine and violation of the controlled substances laws in proximity to a school.

agreement." Scott, supra at 355-356. Additional factors for consideration under the second prong might include, but are not limited to, "whether the defendant was indicted on additional charges," id. at 357, as well as "whether the defendant had a substantial ground of defense that would have been pursued at trial," id. at 356, and whether other special circumstances, such as collateral immigration consequences arising from conviction of a particular crime, were present. Id. at 356 & n.13, citing Commonwealth v. Clarke, 460 Mass. 30, 47-48 (2011).

"Ultimately, a defendant's decision to tender a guilty plea is a unique, individualized decision, and the relevant factors and their relative weight will differ from one case to the next." Scott, 467 Mass. at 356. We emphasized in Scott that "the full context of the defendant's decision to enter a plea agreement will dictate the assessment of his claim that knowledge of Dookhan's misconduct would have influenced the defendant's decision to plead guilty." Id. at 357. "Because a multiplicity of factors may influence a defendant's decision to enter a guilty plea, a court attempting to answer this question must use a wide-angled lens." Ferrara, 456 F.3d at 294.

The defendant contends that the special magistrate erred in concluding that knowledge of Dookhan's misconduct likely would not have been material to the defendant's decision to plead guilty. The defendant points out that he did not have a prior

criminal record, and he contends that he pleaded guilty only because he believed that he had no viable trial strategy in light of the Commonwealth's presentation of the drug certificates. The defendant emphasizes that there was no plea bargain in this case because not only did the Commonwealth refuse to dismiss any of the charges against him, but the prosecutor also urged the judge to impose an aggregate sentence of from four to six years in State prison, rather than three years in a house of correction, as the defendant requested. In the defendant's view, he did not receive a substantial benefit from pleading guilty. Had he known of Dookhan's malfeasance, the defendant continues, he would have had "nothing to lose but everything to gain" by proceeding to trial and challenging the reliability of her work at the Hinton drug lab. We disagree.

Apart from the drug certificates, the evidence against the defendant was strong. Stanton conducted five controlled buys, each of which involved a hand-to-hand exchange of cash for two "twenty" bags or one "forty" bag of an off-white rock-like substance. Not only could a rational jury have inferred that Stanton received what he had requested from the defendant, but field tests conducted on the substances indicated the presumptive presence of cocaine.[22]  See Commonwealth v. Marte, 84

---

[22] Although it does not appear that field tests were performed on the substances recovered from the defendant when he

Mass. App. Ct. 136, 139-142 (2013) (presumptively positive field tests having requisite foundation, together with other corroborative circumstantial evidence, may carry persuasive weight in identifying substances). See also Commonwealth v. Dawson, 399 Mass. 465, 467 (1987) ("Proof that a substance is a particular drug need not be made by chemical analysis and may be made by circumstantial evidence"). Notwithstanding the fact that all but one of the drug certificates were signed by chemists other than Dookhan, evidence of her misconduct would not have detracted from the factual bases supporting the defendant's guilty pleas. Furthermore, apart from Dookhan's malfeasance, there is no evidence that the defendant had a substantial ground of defense that he would have pursued at trial.

Contrary to the defendant's argument, he did receive a significant benefit from pleading guilty instead of proceeding to trial. With respect to six counts of distribution of cocaine and possession of cocaine with intent to distribute, the judge sentenced the defendant to concurrent terms of one year in a house of correction. Had the defendant gone to trial, he could

---

was taken into custody on August 22, 2006, the drug certificates pertaining to those substances, stating that they contained cocaine, were signed on the line labeled "Assistant Analysts" by Kate Corbett and Della Saunders, and there is no evidence that Dookhan was the setup operator for the analyses of those substances.

have been sentenced to from two and one-half years to ten years in State prison, or from one year to two and one-half years in a house of correction, on each count. G. L. c. 94C, § 32A (c), as amended through St. 1991, c. 391. With respect to three counts of violating the controlled substances laws in proximity to a school or park, the judge sentenced the defendant to concurrent terms of two years in a house of correction, to commence on and after the completion of his sentences for the underlying drug crimes. Had the defendant gone to trial, he could have been sentenced to from two and one-half years to fifteen years in State prison, or from two years to two and one-half years in a house of correction, from and after his sentences on the underlying drug crimes, on each count. G. L. c. 94C, § 32J, as amended through St. 1998, c. 194, § 146. In addition, with respect to the marijuana charge, which was placed on file, the defendant could have been sentenced to six months in a house of correction. G. L. c. 94C, § 34, as amended through St. 1996, c. 271, § 1. Regardless of the fact that the defendant did not have a prior criminal record, his decision to plead guilty resulted in the imposition of a far more lenient aggregate sentence than the judge could have imposed following the defendant's likely convictions after trial, given the strength of the Commonwealth's evidence. See Commonwealth v. Mills, 436 Mass. 387, 400 n.9 (2002) (judge may consider defendant's

willingness to admit guilt as factor in more lenient sentencing).  We conclude that the special magistrate did not abuse his discretion or otherwise err in determining that the defendant had failed to satisfy his burden of demonstrating a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct.

8.  <u>Conclusion</u>.  The order denying the defendant's motion to withdraw his guilty pleas is affirmed.

<u>So ordered</u>.