NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-713

COMMONWEALTH

vs.

J.C., a juvenile.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a denial of a motion to suppress, the appellant, Joshua Cohen,[1] entered a conditional guilty plea to two counts contained in a delinquency complaint, possession of a firearm without a license, see G. L. c. 269, § 10 (a), and possession of ammunition without a firearm identification (FID) card, see G. L. c. 269, § 10 (h) (1).  The parties agreed that Joshua reserved his right to appeal from the denial of the motion to suppress.  See Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019); Commonwealth v. Gomez, 480 Mass. 240, 252-253 (2018).

---

[1] A pseudonym.

We accept the facts found by the motion judge based on testimony, absent clear error, but independently review documentary evidence such as video recordings. Commonwealth v. Tremblay, 480 Mass. 645, 654-656 (2018). We may also supplement the facts found by the motion judge with "uncontroverted and undisputed" evidence adduced at the hearing "where the judge explicitly or implicitly credited the witness's testimony." Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). The application of constitutional law to those facts is de novo. Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004).

Facts. On the night of the search, June 12, 2022, Joshua was a fifteen year old boy who had never before been arrested or faced criminal charges and had never been found or known to possess a firearm.[2] The charges in this case are the only charges the child has ever faced.

The judge credited the testimony of the sole witness called at the evidentiary hearing on the motion to suppress, Boston Police Officer Santino D'Addieco. Officer D'Addieco worked for the police department's youth violence strike force, which

_____

[2] Although there is no evidence from the evidentiary hearing that the police were aware of it, the plea hearing reveals that at the time of the warrantless stop in this case, Joshua was in the ninth grade, and he had the second highest grade point average in his class.

focuses on gangs and firearms.  He had eight years of experience as a police officer.

According to D'Addieco's testimony, on June 12, 2022, D'Addieco and two other officers were on patrol in an unmarked Ford Explorer in the Washington Street area of Boston.  The officers were not responding to any reported crimes.

D'Addieco was wearing plain clothes, but with a ballistics vest with the words "Boston Police" on it, his badge on either his vest or his hip, and a body camera.  Although his car was unmarked, he testified that it was readily identifiable as a police vehicle.

While in his vehicle around 9 P.M. on that summer night, he saw a group of people of varying ages standing around a bench at the rear parking lot of a residential building.  The officer saw a bottle of tequila on the bench, some plastic cups, and a cloud of smoke consistent with cigarette smoke.  Some in the group appeared to be over twenty-one years of age, others younger.  D'Addieco recognized the fifteen year old Joshua and a second person, Connor Smith.[3]

The officer explained at the hearing that he knew Joshua because of two encounters with him in the previous three months, in both of which Joshua had been the subject of a field

---

[3] Also a pseudonym.

interrogation observation (FIO) in which the police, without suspicion, gathered personal information about him. See Commonwealth v. Warren, 475 Mass. 530, 534 n.5, 536 (2016). The most recent time, in April, about two months before the night in question, he was walking with two other people, one of them Connor Smith. Joshua was FIO'd by the police, that is, they collected personal information from him. At the end of that police interaction, one of the people he had been walking with was arrested for a firearm-related offense. There is no evidence in the record that it was Smith.

The officer testified that during that encounter there was no suspicion of Joshua for any crime. The officer testified that at that interaction, Joshua had been cordial. He also testified that at that interaction, Joshua was wearing a Houston Rockets hat. The officer testified that Houston Rockets hats are often worn by members of the Ruggles Street Gang as an identifying logo. He testified that at the previous interaction, he "kind of asked [Joshua] if he could name any [Houston Rocket] players, which he couldn't." He testified that on the night of the stop at issue here, when Joshua was also wearing his Rockets hat, "we kind of did the same thing on this occasion, as well;" the body camera footage does show the officer, after arresting Joshua, asking him whether he is still

4

a Rockets fan.  The child responds that the hat "matches my outfit."

The officer testified that about a month prior to that most recent previous interaction, in March, the police, while responding to a report of shots fired in the area, also FIO'd Joshua.  The officer provided no testimony about Joshua's demeanor on that occasion but testified that one of the people he was with at that time was ultimately arrested with a firearm.

Finally, the officer also testified that he was familiar with Joshua because "I know [Joshua] from being present in music videos with multiple . . . Ruggles Street associates."  There was no evidence that these videos included firearms, nor of what the officer meant by "Ruggles Street associates."

The officer testified that on the night of Joshua's arrest, as the police approached and while still in their car, the officer saw two people walking away from the group.  They walked toward the rear entrance of the residential building.  D'Addieco was interested in those two people but he did not know them. The officer exited his vehicle and began slowly approaching the group near the bench.  When he walked toward the group, the fifteen year old Joshua began walking away from the group.  He walked toward the door to the residential building.  At this

time, the second person D'Addieco knew, Connor Smith, began yelling something to D'Addieco's partner.

Instead of approaching the group gathered around the bench, when the child left the group, D'Addieco began following him. The officer testified that he did so "just to make further observations on why he's leaving the group." D'Addieco testified that when Joshua turned and began walking toward the residential building, D'Addieco saw a "bulge" under Joshua's clothing on his right side.

Joshua was not running. He did not put his hands in his pocket. He did not make any statements or threats to police. He did not even look back toward the officer, who was about ten feet behind him. He did not act belligerently, nor was he acting confrontationally. He made no furtive moves.

In short, he was not engaged in any of the types of conduct our courts have found support suspicion of possession of a handgun, such as grabbing his waistband, Commonwealth v. Karen K., 491 Mass. 165, 175-176 (2023), blading his stance, Commonwealth v. Resende, 474 Mass. 455, 458-459, 461, S.C., 475 Mass. 1 (2016), holding his hand in his pocket and making "retention checks" -- appearing to touch the location where a heavy object is stored to make sure it stays in place -- id., or

walking with his arms stiff and straight, Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007).

As Joshua approached the entrance to the residential building, he said something or motioned to the two other people who had left the group and were walking ahead of him. He was wearing a shirt that covered his hip and belt area. The officer testified that at this point in time, he could see a "large bulge" under Joshua's clothes. The officer testified that the bulge was under Joshua's clothing both over and under Joshua's waistline, "on his hip."

As the child began to enter the residential building, but before he could go through the door, Officer D'Addieco grabbed his left arm, physically stopping him in order to conduct a "pat frisk." Joshua's back was to the officer. Having grabbed his left arm, the officer turned him to stop him from continuing to walk. As the officer was reaching for Joshua, the officer stepped on Joshua's foot causing his shoe to fall off, apparently accidentally. The officer performed a "pat frisk" and felt the handle of a firearm, which he seized after putting Joshua in handcuffs.

Discussion. Joshua was stopped in the constitutional sense when the officer grabbed his arm. Commonwealth v. Shane S., 92 Mass. App. Ct. 314, 322 (2017). See Commonwealth v. Matta, 483

7

Mass. 357, 363 (2019) (seizure occurs when "a reasonable person would believe that an officer would compel him or her to stay"). In order to engage in the patfrisk during which the gun was found, the officer was required to have reasonable suspicion based on articulable facts that Joshua was armed and dangerous. Karen K., 491 Mass. at 175. In this case, the answer to whether there was reasonable suspicion that Joshua was armed turns on whether there was reasonable suspicion he was in possession of a firearm.

The Commonwealth argues first that Officer D'Addieco's substantial and specific firearm training and cumulative experience provided him with reasonable suspicion that the bulge at Joshua's right hip or waist area was a firearm. The officer testified to the presence of a "bulge" or "large bulge" under the defendant's clothing crossing his waistband in the area of his right hip that was "protruding from his waist, his waistline, like on his hip."

The officer testified that he was trained that "most people who carry a firearm unlawfully are carrying it in their waistline and they're not holstered. So there's, you could clearly see, like, a bulge." He testified that when he saw the bulge under Joshua's clothes it was significant to him because it was "part of the characteristics of a person who's carrying

8

an unlawful firearm.  That bulge, to me, shows that there's a possible firearm right there.  It's something to pay attention, to make note of, especially with the behavior."

Over three decades ago, however, we opined that a bulge, even "a bulge in the [person's] right hand pocket which seemed shaped like a pistol," standing alone, could not provide reasonable suspicion that a person is carrying a firearm. Commonwealth v. Holmes, 34 Mass. App. Ct. 916, 917-918 (1993). Too many other things could cause such a bulge, including items worn on one's belt or in one's front pocket, like phones, water bottles, and other lawful items.

The Commonwealth argues that the bulge can provide reasonable suspicion because "Officer D'Addieco exhibited his training and experience during his testimony when he explained why neither a water bottle nor a cellphone would be reasonable explanations for a bulge in that particular location on a person's clothing."  But in fact, the officer testified that he had seen people carry water bottles in their "pant[s] pocket" as well as their back pockets, and when asked whether "kids carry a cell phone in their front pocket," he responded, "It could have been."

He did also testify that "kids in this generation do not carry cell phones on their hip."  But how young people carry

9

cell phones -- and what else they may carry -- is not a matter of special police knowledge or the kind of issue with respect to which, as the Commonwealth argues, "[a] trained law enforcement officer may draw inferences and make deductions that would elude a lay person." Commonwealth v. King, 389 Mass. 233, 243 (1983), S.C., 400 Mass. 283 (1987), citing United States v. Cortez, 449 U.S. 411 (1981). In Cortez, supra at 413, on which the Commonwealth would ultimately rely for this proposition, the evidence at issue, far from being a matter of common experience, involved groups of footprints found in the desert near the Mexican border including "one recurring shoeprint [that] bore a distinctive and repetitive V-shaped or chevron design." In any event, the officer in this case did not testify that his opinion was drawn from his training or police experience. The police may not stop and pat frisk any individual or any young person they see solely because they have such a bulge under their clothing.

Of course, a bulge at the waistband, "consistent with the size of a firearm," Commonwealth v. Evelyn, 485 Mass. 691, 694-695 (2020), can when combined with other facts in some circumstances give rise to reasonable suspicion that the bulge is caused by an unlawful firearm. The Commonwealth also argues that the juvenile's "possible" or "suspected" gang association

10

"and previous police interactions surrounding firearm offenses" add to suspicion about the bulge.  Under Commonwealth v. Elysee, 77 Mass. App. Ct. 833, 841 (2010), of course, "gang membership" is not irrelevant to determining whether there is reasonable suspicion of a risk to officer safety, although that is not a case about whether someone was armed.  But there was no evidence that Joshua was known or even believed to be a gang member at all, and there was no testimony that his wearing a Houston Rockets hat meant that he was.  He was said to be in "music videos" with "[gang] associates," not gang members.  It is not clear what qualifies one as a "gang associate," though in neighborhoods with a great deal of gang activity that might cover any number of nongang members.  In any event, we think it clear that police cannot without more pat frisk even every possible gang member they encounter who has a bulge in their waist or hip area.

As to previous firearms offenses, Joshua had committed none.  Given his involvement in Joshua's prior police encounters, Officer D'Addieco was aware that Joshua had not been arrested for possession of a firearm on either of these occasions, and the FIOs would have revealed Joshua had no criminal record of any kind.  The Commonwealth describes him as having been in the "proximity" of prior firearms offenses.  But

proximity to even a recent crime doesn't provide reasonable suspicion one committed it.  Evelyn, 485 Mass. at 705. Proximity to two crimes that one is known to have been innocent of thus does not add much to the suspicion that one is now guilty of the same crime.  And, even combined with the Rockets hat, without something additional suggesting the presence of a firearm, it does not make the suspicion reasonable that a bulge under clothing around someone's waistline near the right hip was a firearm.

The Commonwealth also relies on Joshua's walking away from the group when he saw the police approach.  It argues that the juvenile's almost-immediate departure from the area upon seeing Officer D'Addieco "significantly contributed to his reasonable suspicion of criminal activity."  And it emphasizes that during the April encounter, Joshua had not walked away but had approached Officer D'Addieco.  It argues that an "individual's change in behavior towards an officer" compared to prior encounters "may contribute to the officer's reasonable suspicion that that individual is engaging in criminal activity."

The Supreme Judicial Court has cautioned us that, "[w]here a suspect is under no obligation to respond to a police officer's inquiry," even "flight to avoid that contact should be given little, if any, weight as a factor probative of reasonable

12

suspicion." <u>Warren</u>, 475 Mass. at 539.  Indeed, the Supreme Judicial Court has said that where, as here, a Black man deliberately avoids police in the city of Boston, such behavior has even less weight than it otherwise would.  <u>Id</u>. at 540.  That is, in part, because of a study showing:

> "[B]lack men in the city of Boston were more likely to be targeted for police-civilian encounters such as stops, frisks, searches, observations, and interrogations.  Black men were also disproportionally targeted for repeat police encounters. . . .  [T]he finding that [B]lack males in Boston are disproportionately and repeatedly targeted for FIO encounters suggests a reason for flight totally unrelated to consciousness of guilt.  Such an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity."  (Footnotes omitted.)

<u>Id</u>. at 540-41.  And, although applicability of <u>Warren</u> does not turn on it, of course this was the third time in less than four months that Joshua had been approached for interrogation by this very officer.

As described, the Commonwealth also argues that the change in demeanor from Joshua's previous interactions with police was suspicious.  It argues that in the interaction with police immediately preceding this one, Joshua approached Officer D'Addieco's cruiser to speak with him and was cordial, whereas this time, he walked away.  Of course, with no information about Joshua's participation in the first of his three encounters with the police officer, it is not even clear that there was anything

13

new about his walking away.  But, in any event, people have "freedom to speak or not to speak to a police officer.  A person also may choose to walk away, avoiding altogether any contact with police," and exercising the latter choice in the circumstances of this case is entitled to less than little-to-no-weight in the reasonable suspicion calculus.  Warren, 475 Mass. at 538.  It would be no choice at all if the decision to speak cordially with police one time meant that walking away another time would tip the scales of reasonable suspicion.

This is not a case like Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 745 (2021), cert. denied, 143 S. Ct. 135 (2022), where officers already interpreted the suspect's erratic behavior as an effort to draw police attention away from a vehicle and its contents, and where the court took into account that the suspect's loud and confrontational behavior differed from that in which the suspect had engaged during previous encounters with the police, such that it properly compounded the officers' previous suspicion.  Here, Joshua walked quietly away from police and engaged in no unusual or otherwise suspicious behavior while walking to the back door of the residential building.

Finally, the Commonwealth also argues that it was a "high crime" area based upon the officer's testimony that "that area

14

on Washington Street, there's a few different neighborhoods that typically feud with each other.  So it's pretty active around shots fired, person-with-a-gun calls, that type of thing."  The Supreme Judicial Court, however, has held that "we consider this factor only if the 'high crime' nature of the area has a 'direct connection with the specific location and activity being investigated.'"  Evelyn, 485 Mass. at 709, quoting Commonwealth v. Torres-Pagan, 484 Mass. 34, 41 (2020).  There, the court did not consider the "high crime" factor where the officer "testified that there had been an ongoing feud between gangs in the area" and the Commonwealth introduced "the incident numbers of other police reports of alleged gang-related crimes in the vicinity in the months prior to the shooting," but "[t]he dates, precise locations, and alleged perpetrators of those incidents were not provided."  Evelyn, supra.  That decision controls the issue here.

In all other cases of which we are aware, a bulge at the waistband, "consistent with the size of a firearm," Evelyn, 485 Mass. at 694-695, has been found to support a finding of reasonable suspicion of an unlawful firearm only when accompanied by other behaviors that are indicative of unlawful firearm possession, such as repeatedly looking back at the police and adjusting the bulge while walking away, Commonwealth

15

v. Colon, 87 Mass. App. Ct. 398, 400-402 (2015); holding one's waistband, or something in that area, while walking or running, indicating one may be storing a firearm there, see Commonwealth v. Ware, 76 Mass. App. Ct. 53, 54, 56 (2009), and Commonwealth v. Nestor N., 67 Mass. App. Ct. 225, 227, 231 (2006); walking with a straight arm, DePeiza, 449 Mass. at 371, or with a limping gait, Nestor N., supra at 231; and awkwardly turning one's body in order to hide the bulge from the police, Evelyn, 485 Mass at 708. Joshua engaged in none of these types of behaviors here.

Taken together, the articulable facts known by the officer did not support reasonable suspicion, rather than a hunch, that the bulge was caused by a firearm. Without reasonable suspicion of that, the pat frisk was not legally justified. Therefore, the order denying the motion to suppress is reversed.

So ordered.

By the Court (Rubin, Desmond & Singh, JJ.[4]),

Clerk

Entered: April 24, 2025.

---

[4] The panelists are listed in order of seniority.

16