NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1802                                      Appeals Court

COMMONWEALTH  vs.  DANNY ANTONE.


No. 14-P-1802.

Bristol.     February 5, 2016. – January 4, 2017.

Present:  Green, Hanlon, & Henry, JJ.


Controlled Substances.  Practice, Criminal, New trial, Plea, Conduct of government agents, Disclosure of evidence. Evidence, Certificate of drug analysis, Exculpatory.



Indictments found and returned in the Superior Court Department on November 4, 2010.

A motion to vacate a guilty plea and for a new trial, filed on October 18, 2012, was heard by Wendie Gershengorn, J., special judicial magistrate, and an order affirming the proposed order of the special judicial magistrate was entered by Renee P. Dupuis, J.


Sharon L. Sullivan-Puccini for the defendant.
David A. Wittenberg, Assistant District Attorney, for the Commonwealth.


HENRY, J.  The defendant, Danny Antone, appeals from an order denying his motion to vacate his guilty plea to the offense of trafficking in cocaine (one hundred grams or more),

G. L. c. 94C, § 32E(b)(3). His motion arises from the misconduct of Annie Dookhan, a chemist who was employed at the William A. Hinton State Laboratory Institute (Hinton lab or lab). See Commonwealth v. Scott, 467 Mass. 336, 337-342, 349-350 (2014) (describing Dookhan's misconduct). On appeal, the defendant argues that his motion should have been allowed because (1) there was a reasonable probability that he would not have pleaded guilty if he had known of Dookhan's misconduct, (2) the Commonwealth failed to provide exculpatory evidence concerning Dookhan's misconduct, and (3) Dookhan's misconduct constitutes newly discovered evidence. We affirm.

Background. 1. Facts pertaining to plea.[1] As the result of information provided by a confidential informant (CI) in the summer of 2010, the New Bedford police began to conduct surveillance of the defendant. On one occasion they observed him make a variety of maneuvers while driving his vehicle that

---

[1] We summarize the facts found by the Regional Administrative Justice, reserving certain details for discussion with the issues raised. See Commonwealth v. Charles, 466 Mass. 63 (2013) (describing role and authority of Regional Administrative Justices and special judicial magistrates in procedures adopted for matters related to Dookhan's misconduct). As the Regional Administrative Justice adopted the findings of the special judicial magistrate, we treat the magistrate's findings as those of the Regional Administrative Justice. See Commonwealth v. Williams, 89 Mass. App. Ct. 383, 388 (2016). We supplement those findings "with evidence in the record that is uncontroverted and that was implicitly credited by the [Regional Administrative Justice]." Commonwealth v. Hernandez, 473 Mass. 379, 380 (2015) (quotations omitted).

were consistent with someone conducting "counter surveillance." The police arranged for the CI to make two controlled purchases of cocaine from the defendant.[2] The police field test of the substance in each controlled purchase was positive for cocaine.

Based on this information, the police obtained search warrants on August 13, 2010, for the defendant's home and vehicle. In preparation for execution of the warrants, the police began surveillance of the defendant's home on August 18, 2010. At approximately 9:00 P.M., they observed him depart in his vehicle. The police followed and eventually stopped the defendant's vehicle. Detective Justin Kagan approached the vehicle on foot and observed that the defendant had locked his doors and was drinking from a plastic water bottle. Detective Evan Bielski, who also was present, stated that, based on his training and experience, the defendant's conduct was consistent with swallowing drugs. When the defendant refused the detectives' requests to open the door, the detectives broke one of the windows. After a brief struggle, the defendant was taken into custody.

The police took the defendant back to his home, which was within one thousand feet of a public school, and showed him

---

[2] Immediately after completing each controlled purchase, the CI gave the purchased substance to the police. For both controlled purchases, surveillance was constant and at no time did the CI meet with anyone else.

copies of the search warrants. Bielski noticed newly installed steel doors at the home. Although initially uncooperative, the defendant eventually agreed to disclose the location of the "drugs." He led the police into a bedroom and indicated that the drugs were in a tote bag. Inside the tote bag, Detective Haggerty discovered four plastic bags containing a substance that Bielski, based on his training and experience, believed to be cocaine. These bags, which were weighed at the police station, had a combined weight well over 200 grams. Detective Gracia found a fifth plastic bag containing a small amount of a substance that Bielski similarly identified as cocaine. Also recovered during the search of the home was cash in the amount of $220 (ninety dollars of which was in nine rolls of ten one dollar bills), three pairs of binoculars, scales, packaging materials, cutting agents, a cellular telephone, and cocaine cooking materials, including metal strainers, a hot plate with a pot of water on it, and four glass tubes. All of the cooking and packaging materials were set up in a storage room. According to Bielski, the room dedicated to cooking and processing the cocaine in combination with the cocaine and cutting agents, both of which Bielski identified, indicated the defendant was engaged in cocaine distribution and sale, rather than personal use. Bielski also stated that the binoculars were significant because they were counter-surveillance equipment.

The five plastic bags containing substances that Bielski identified as cocaine were sent to the Hinton Lab for analysis. The lab issued four certificates; one certificate was issued for two of the bags. Each certificate is signed by Della Saunders as the primary chemist and Dookhan as the confirmatory chemist and is dated September 8, 2010. Each certificate identifies the substance in each bag as one containing cocaine, as defined in G. L. c. 94C, § 31, and lists the weight of the substances. The aggregate weight of the substances is 266.88 grams. Both Saunders and Dookhan were listed as expert witnesses for the Commonwealth in a joint pretrial memorandum.

At the defendant's plea hearing on April 25, 2012, the judge was informed by the parties that the defendant had agreed to plead guilty in exchange for the reduction of the charge of trafficking in 200 or more grams of cocaine to trafficking in 100 or more grams of cocaine, a sentencing recommendation of from ten to twelve years in State prison, and the entry of a nolle prosequi on the habitual offender and school zone charges. The agreement eliminated the risk that the defendant, who was fifty-seven years old, would face a minimum mandatory twenty-two year sentence.[3] The judge accepted the defendant's guilty plea

---

[3] At the time, the trafficking offense carried a minimum mandatory sentence of fifteen years and a maximum sentence of twenty years. The habitual offender charge required the imposition of the maximum sentence for the underlying offense,

to the reduced charge and imposed the recommended sentence.  The Commonwealth nol prossed the two remaining charges.

2.  Motion to vacate plea.  About six months after the defendant's plea, in light of the issues that surfaced at the Hinton lab, the defendant moved to withdraw his guilty plea.  After a hearing at which exhibits were introduced, a special judicial magistrate, who had been assigned to preside over criminal cases related to Dookhan's misconduct, issued findings, rulings, and a proposed order denying the defendant's motion.

The magistrate applied the two-prong test set forth in Commonwealth v. Scott, 467 Mass. at 346-358 (Ferrara-Scott test).

As to the first prong, the magistrate found that the defendant was entitled to a conclusive presumption that egregious government misconduct occurred in his case because he had "furnished drug analysis certificates bearing Annie Dookhan's signature on the line labeled 'Assistant Analyst.'"

As to the second prong, the magistrate concluded that the defendant "fail[ed] to demonstrate a reasonable probability that, had he known of Dookhan's misconduct, he would have rejected the plea deal and proceeded to trial."  The magistrate rested this conclusion on her findings that "the presence of

here twenty years, and the school zone charge required a minimum two-year sentence to be served on and after the sentence imposed on the underlying conviction.

strong circumstantial evidence of drug distribution, including distribution materials, [the defendant's] evasive behavior, and [the defendant's] personal knowledge as to the location of the cocaine in the target residence, diminishe[d] the materiality of the drug certificates" and that the plea deal considerably reduced the defendant's exposure to committed time. Given the "appreciable benefits of the plea deal" and "the strong circumstantial evidence underlying the charges," the magistrate was "not convinced that a reasonable defendant in [the defendant's] shoes would have rejected the deal had information of Dookhan's malfeasance been available." The magistrate therefore recommended that the defendant's motion be denied.

The defendant filed an objection to the magistrate's findings, rulings, and proposed order. See Commonwealth v. Charles, 466 Mass. at 71 & n.9 (describing review procedure). The Regional Administrative Justice (motion judge) adopted the magistrate's findings and rulings and denied the defendant's motion, adding as a basis for the denial that Dookhan was not the primary chemist.[4] This appeal followed.

---

[4] The defendant argues that the motion judge applied the wrong standard of review because she adopted the magistrate's findings and the magistrate stated that she was "not convinced that a reasonable defendant in Antone's shoes would have rejected the deal had information of Dookhan's malfeasance been available." We disagree. The motion judge's findings apply the correct standard, and specifically state that she adopted the magistrate's "analysis that Antone has not demonstrated a

Discussion. 1. Standard of review. "A motion to withdraw a guilty plea is treated as a motion for a new trial under Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001)." Commonwealth v. Furr, 454 Mass. 101, 106 (2009). The disposition of such a motion is "committed to the sound discretion of the judge." Scott, supra at 344. "[T]he judge's findings of fact are to be accepted if supported by the evidence." Ibid. "We review an order [on] a new trial motion to determine if the judge committed a significant error of law or other abuse of discretion." Ibid. (quotation omitted). Here, because the motion judge adopted the magistrate's findings and rulings, we apply the same standard of review to them. Commonwealth v. Williams, 89 Mass. App. Ct. 383, 388 (2016). As the motion judge also was the plea judge, "[w]e grant substantial deference to [her] decision." Commonwealth v. Sylvain, 473 Mass. 832, 835 (2016) (quotations omitted).

2. Ferrara-Scott test. Relying on Ferrara v. United States, 456 F.3d 278, 290-297 (1st Cir. 2006), the Supreme Judicial Court articulated a two-prong test for analyzing a defendant's motion to withdraw a guilty plea in cases involving Dookhan's misconduct at the Hinton lab. See Scott, 467 Mass. at

_____

reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct."

346-358. See also <u>Bridgeman</u> v. <u>District Attorney for the Suffolk Dist</u>., 471 Mass. 465, 467 n.6 (2015).

Under the first prong, a defendant must show egregious misconduct by the government that preceded the entry of the defendant's guilty plea and where, as here, Dookhan signed the certificates as an assistant analyst before the defendant entered his plea, <u>Scott</u> provides that such misconduct is conclusively presumed.[5] <u>Scott</u>, <u>supra</u> at 347, 351-352. See <u>Commonwealth</u> v. <u>Ruffin</u>, 475 Mass. 1003, 1004 (2016) ("Underlying [the conclusive presumption established in <u>Scott</u>] is the assumption that the misconduct evidenced by the certificate antedated the guilty plea").

Under the second prong, the defendant "must demonstrate a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct." <u>Scott</u>, <u>supra</u> at 355. The defendant must "particularize Dookhan's misconduct to his decision to tender a guilty plea." <u>Id</u>. at 354. This is necessarily a fact-specific inquiry.[6] See <u>id</u>. at 356.

---

[5] The finding on the first prong is not challenged on appeal. We note that it is supported by the record: Dookhan signed the certificates as an assistant analyst on September 8, 2010, and the defendant entered his plea on April 25, 2012.

[6] The court in <u>Scott</u> outlined the factors that may be relevant to the defendant's showing under this prong, which "include (1) whether evidence of the government misconduct could have detracted from the factual basis used to support the guilty plea, (2) whether the evidence could have been used to impeach a

The thrust of the defendant's claim is that, had he known about Dookhan's misconduct, he would have insisted on going to trial because it is likely Dookhan's misconduct would have invalidated the lab's analysis of the substances and the Commonwealth, therefore, would not have been able to prove they were cocaine.[7] Specifically, he emphasizes that the confirmatory testing performed by Dookhan is a far more discriminating process than that used in the simple bench top tests conducted by the primary chemist, and because the confirmatory test was not performed, the primary test was not confirmed.[8] See Scott,

witness whose credibility may have been outcome-determinative, (3) whether the evidence was cumulative of other evidence already in the defendant's possession, (4) whether the evidence would have influenced counsel's recommendation as to whether to accept a particular plea offer, and (5) whether the value of the evidence was outweighed by the benefits of entering into the plea agreement." Scott, supra at 355. Additional factors "may include whether the defendant had a substantial ground of defense that would have been pursued at trial or whether any other special circumstances were present on which the defendant may have placed particular emphasis in deciding whether to accept the government's offer of a plea agreement." Id. at 356.

[7] The defendant also asserts that "the weight of the substances is called into question where the police weighed it at the station with an unspecified, presumably un-calibrated device." As the police and the primary chemist independently weighed the substances and both determined the substances weighed well over 200 grams, we see no merit in the defendant's assertion.

[8] It has since been learned that the labels "primary chemist" and "confirmatory chemist" are terms of art. The primary chemist "would be responsible for weighing the samples and conducting preliminary bench tests," "make preliminary determinations as to the identities of the samples," and prepare

supra at 340-341 (describing Hinton lab protocols for primary and confirmatory tests).

Relying on Commonwealth v. Gaston, 86 Mass. App. Ct. 568, 574 (2014), the defendant argues that without the far more discriminating confirmatory test, the primary test could not be used by the Commonwealth to prove the substances were cocaine. In Gaston, however, the question was whether there was a "substantial risk that the jury would have reached a different conclusion" had evidence of Dookhan's misconduct and her role as the confirmatory chemist been admitted at trial. Id. at 573. The court questioned, without deciding, whether the primary tests were sufficiently reliable to be admitted but reasoned that "[i]f admitted, standing alone, [the tests'] discriminatory weaknesses provide fodder for cross-examination." Id. at 574. The Gaston court, in reviewing Dookhan's misconduct in the context of a trial, concluded that the misconduct would have been a real factor in the jury's deliberations, ibid., and granted the defendant a new trial. See id. at 576.

---

samples "for the confirmatory testing process." Commonwealth v. Resende, 475 Mass. 1, 8 (2016). Unlike the primary chemist, "the confirmatory chemist uses sophisticated instrumentation . . . that has both a high discriminatory power to identify the substance and the ability to produce instrument-generated documentation of test results." Commonwealth v. Gaston, 86 Mass. App. Ct. 568, 574 (2014).

Here, unlike in Gaston, the issue is whether the defendant would have pleaded guilty had he known of Dookhan's misconduct, not whether her misconduct was a real factor at a jury trial. To address this question, the Commonwealth obtained a detailed affidavit from the primary chemist in this case, Saunders, regarding the analysis she performed.[9] Saunders stated that after making sure the evidence (the plastic bags containing the substances to be tested) matched the description on the evidence control cards, she signed it out of the evidence office. She determined the net weight of the substance contained in each plastic bag. Saunders then performed tests, including color and

---

[9] Given the motion judge's statement that "[n]o reasonable person in [the defendant's] position would have rejected the Commonwealth's deal, especially in view of the fact that Dookhan was not the primary chemist in the matter," we can infer that the judge credited Saunders's affidavit and viewed her initial testing as potentially showing that the substance was cocaine and, in turn, a basis for accepting the plea. The defendant's brief does not dispute the validity of the affidavit. Instead, it argues that the motion judge's finding "ignores the importance of the secondary chemist" whose testing is more "sophisticated" and "discriminatory" -- an argument that implicitly credits Saunders's affidavit as outlining the lack of sophisticated testing.

We note that defense counsel did not challenge the admission of Saunders's affidavit at the motion hearing and, in fact, used it to support the defendant's motion. Further, while the affidavit did not exist at the time of the defendant's plea, he would have known -- from the certificates and a joint pretrial memorandum that lists Saunders as an expert witness for the Commonwealth -- that Saunders played a role in determining that the substances were cocaine and the nature of that role as later explained in the affidavit would have been discoverable.

microcrystalline tests, on the substance in each plastic bag and documented that her findings were consistent with the presence of cocaine. Next, Saunders took a small sample of the substance in each plastic bag and placed it in a glass vial, added a reagent, capped the vial, and submitted only the vials and the evidence control cards to the gas chromatogram/mass spectrometer section of the lab for confirmatory testing. Saunders secured the plastic bags in her evidence locker, to which only she and her supervisor had a key. After the confirmatory tests were completed, the evidence control cards were returned to Saunders; the cards contained Dookhan's initials and confirmatory findings of cocaine. The evidence office generated certificates, which were signed by Saunders and Dookhan and notarized. Saunders then returned the plastic bags to the evidence office.

There is little question that had the defendant been aware of Dookhan's misconduct when deciding to plead guilty, he would have concluded that the confirmatory and far more inculpatory testing could not be used against him, but that conclusion does not necessarily render the work of the primary chemist a nullity. Saunders's affidavit makes clear that she performed at least two tests that indicated the substances were consistent with cocaine and that her role in testing and storing the substances was entirely independent of the testing done by Dookhan. While there may have been some uncertainty whether the

results of primary testing would be admissible at trial, see Gaston, 86 Mass. App. Ct. at 574, in deciding whether to plead guilty the defendant had to consider the likelihood that at least some aspect of that testing would be admissible, in the same way that field tests may be admitted.  See Commonwealth v. Marte, 84 Mass. App. Ct. 136, 140-144 (2013) (field testing admitted; and in combination with circumstantial evidence sufficient to prove identity of substance).

Moreover, as found by the motion judge, there was significant additional evidence that suggested the substances at issue were cocaine.  See Commonwealth v. Dawson, 399 Mass. 465, 467 (1987) ("Proof that a substance is a particular drug need not be made by chemical analysis and may be made by circumstantial evidence").  The police had conducted two controlled purchases from the defendant and both substances purchased field tested positive for cocaine; a room in the defendant's home had all the requisite supplies, tools, and instruments specific to cooking, processing, and packaging cocaine for distribution; the defendant pointed out the "drugs" to the police; and an experienced detective, based on his training and experience, was potentially available to testify.

While there is no guarantee that the detective who identified the drugs as cocaine before the grand jury would have been able to testify to that opinion at trial, the defendant, in

deciding whether to plead guilty, had to consider the possibility that the detective would be qualified to testify that the substances were consistent with cocaine.  The detective's testimony that the substances' appearance was consistent with cocaine would have been inculpatory.  And to the extent the defendant claims that the controlled purchases and the materials found in his apartment evidence merely distribution rather than the composition of the substances, he overlooks proof that the controlled purchases involved only cocaine, his apartment was specifically set up for cooking and processing cocaine, and the only drugs found in the apartment were identified by the police as consistent with cocaine.  The nature of the distribution enterprise lends circumstantial force to the inference that the substance was cocaine.  In sum, there was significant evidence, apart from the confirmatory test by Dookhan, that the Commonwealth may have been able to use to prove that the substances were cocaine.

In addition, as the motion judge found, the plea agreement significantly reduced the defendant's sentence.  See Scott, 467 Mass. at 357 (noting that when assessing second prong of Ferrara-Scott test, judge may consider sentence reduction resulting from plea).  The agreement enabled the defendant, who was fifty-seven years old at the time of the plea hearing, to avoid a minimum mandatory twenty-two year sentence and receive a

ten to twelve year sentence.[10]  In these circumstances, the value of the evidence of Dookhan's misconduct was outweighed by the benefits of entering into a favorable plea agreement that eliminated potentially ten additional years in prison in a case in which the defendant was confronted with a variety of evidence, apart from the confirmatory test conducted by Dookhan, that the Commonwealth may have been able to use to prove the substances were cocaine.  Contrary to the affidavits submitted by the defendant and his attorney, the motion judge did not err in concluding that "[n]o reasonable person in [the defendant's] position would have rejected the Commonwealth's deal."

3.  <u>Exculpatory and newly discovered evidence claims</u>.  The defendant also contends that the motion to vacate his guilty plea should have been allowed on the basis that the Commonwealth failed to provide exculpatory evidence (prosecutorial nondisclosure claim) concerning Dookhan's misconduct, as required by Mass.R.Crim.P. 14(a)(1)(A), as amended, 444 Mass.

---

[10] The magistrate and the motion judge both thought that the defendant faced a mandatory fifteen year sentence if found guilty on the original charge of trafficking in 200 or more grams of cocaine, and that the plea deal offered by the Commonwealth, which reduced the charge to trafficking in 100 or more grams of cocaine, enabled the defendant to avoid five additional years of committed time.  In fact, the benefit to the defendant was greater, as the plea deal included the entry of a nolle prosequi on an habitual offender charge, which enabled the defendant to avoid a mandatory twenty year sentence on the original trafficking charge.  See note 3, <u>supra</u>.

1501 (2005), and the United States and Massachusetts Constitutions, see Brady v. Maryland, 373 U.S. 83 (1963), and that Dookhan's misconduct constitutes newly discovered evidence.[11]

Knowledge of Dookhan's misconduct evolved over a number of months as the investigation progressed. The defendant complains that the Commonwealth did not disclose letters sent by Dr. Linda Han, the director of the Bureau of Laboratory Sciences, to the Norfolk and Suffolk County[12] district attorney's offices and ultimately all district attorneys for all counties. The first letter was dated February 1, 2012, and addressed to the Norfolk district attorney, informing him of a "possible breach of protocol with respect to ninety drug samples" tested at the lab and that were exclusively from Norfolk County.[13] The second

---

[11] We assume, without deciding, that Brady applies and that the defendant's claim of prosecutorial nondisclosure is not waived by the entry of his guilty plea. See Scott, supra at 346 n.5, 359 n.15.

[12] The defendant's case was in Bristol County.

[13] On January 31, 2012, the Governor's legal counsel gave notice of a breach of protocol relating to ninety samples from Norfolk County to the Norfolk County district attorney, the United States Attorney for the District of Massachusetts, and the Massachusetts District Attorneys Association. The defendant argues it is reasonable to conclude that the District Attorneys Association notified individual district attorneys. The Commonwealth does not state whether it received this notice or a copy of the follow up letter of February 1, but did argue that the letter offered reassurances of the integrity of the samples and "accuracy of the sample analysis."

letter, dated February 21, 2012, outlined a breach of protocol related to the ninety samples from Norfolk County and described the failure of a chemist to properly log the transfer of the samples that she removed from the evidence office for testing.[14] The letter further indicated that, although the chemist responsible for these mistakes was an otherwise exemplary employee, she had been removed from all responsibilities involving laboratory analysis. The letter also indicated that an investigation found "there was no evidence to suggest that the integrity of the results was impacted by the documentation issue with the log book." The letter did not name the chemist involved.

The defendant also has identified a third letter, dated April 20, 2012, just five days before his plea, from Dr. Han to the Suffolk County district attorney about the investigation into the handling of the Norfolk County evidence. The defendant argues that it is reasonable to conclude that all of the district attorneys' offices received a similar letter and the magistrate assumed they received the letters. No information in these three letters suggests tests conducted on any evidence

---

[14] The defendant's brief notes that the executive summary in the Hinton Laboratory Drug Lab Internal Inquiry states, "[t]he February 21 letter was disseminated to all county District Attorneys Offices in the Commonwealth."

submitted from Bristol County were involved in the breach of protocol, and the April 20 letter affirmatively states only Norfolk County evidence was "involved."

Finally, the defendant cites to evidence of a fourth letter sent from a defense attorney to the Bristol County district attorney's office two weeks prior to the defendant's plea. That letter of April 11, 2012, identifies Dookhan as the chemist involved in misconduct at the lab and indicates that despite Dookhan's suspension from her duties, she had testified as an expert chemist in a Bristol County criminal prosecution without disclosing her suspension.[15]

Even if we assume that the letters were disseminated to all the district attorneys before the date of the defendant's guilty plea on April 25, 2012, and that they might have some exculpatory benefit, the defendant fares no better, whether the letters are viewed as exculpatory or newly discovered evidence.

In Scott, the Supreme Judicial Court discussed at length the similarity among the standards used to assess prejudice to the defendant under the second prong of the Ferrara test (see discussion, supra), the test for prosecutorial nondisclosure under Federal case law, and our formulation of the test for cases in which a defendant claims that counsel's ineffective

---

[15] The April 11, 2012, letter is not in the record. Rather, the defendant has included a September 5, 2012, letter referring to the existence of the April 11 letter.

assistance induced the defendant to plead guilty.  See Scott,
467 Mass. at 346 n.5, 355-356 & n.12, 359 n.15.  See also
Commonwealth v. Clarke, 460 Mass. 30, 46-48 (2011) (prejudice
test for withdrawal of guilty plea in ineffective assistance of
counsel cases).  As the court concluded in Scott:

> "[I]f a defendant is unable to establish prejudice under
> the second prong of the Ferrara analysis, it is likely that
> he or she would be unable to make the showing of prejudice
> required by [his or her claims of newly discovered evidence
> and prosecutorial nondisclosure] as well.  Therefore,
> [consideration] of the defendant's motion based on the
> voluntariness analysis . . . set forth in [Scott] should be
> sufficient to dispose of [these claims]."

Scott, supra at 361-362 (citations omitted).

Where we have found that the motion judge did not commit an
error of law or abuse of discretion in determining that the
defendant had failed to satisfy his burden of demonstrating a
reasonable probability that he would not have pleaded guilty had
he known of Dookhan's misconduct, we similarly conclude that he
has not satisfied his burden on his prosecutorial nondisclosure
and newly discovered evidence claims concerning that same
misconduct.

> Order denying motion to
> vacate guilty plea
> affirmed.