The defendant entered unagreed guilty pleas to five drug charges. After learning of assistant lab analyst Annie Dookhan's misconduct,[2] he filed a motion for new trial seeking to withdraw the guilty pleas. A judge of the Superior Court denied the motion. We reverse.
Facts. We recite the relevant facts as found below.[3] Around January 29, 2009, officers at the Billerica police department received information from two confidential informants that the informants had purchased drugs, including OxyContin, from the defendant. One informant also told the officers that the defendant sourced his OxyContin from an eighty year old woman living on Gorham Street in Lowell who had a prescription for them and who had recently been robbed.[4]
On February 3, 2009, one of the informants, in the presence of a Drug Enforcement Agency (DEA) agent, bought five pills allegedly containing morphine from the defendant as part of a controlled buy. The DEA agent then conducted three more controlled buys on February 6, 9, and 13, 2009. At each buy, he purchased two pills that the defendant stated were OxyContin, and drove with the defendant to what, according to the defendant, was his supplier's house on Gorham Street in Lowell. Over the course of the buys, the defendant told the DEA agent, as he had the confidential informant, that his supplier was an eighty year old woman with a prescription for OxyContin who had recently been robbed. The police had a record of a robbery of OxyContin from the Gorham Street house of an eighty year old woman.
Later, after selling a nonfunctioning hand grenade to one of the aforementioned informants, the defendant expressed to the informant an interest in purchasing machine guns, a handgun, and a silencer "to make that up to you." The informant set him up with an undercover agent from the Bureau of Alcohol, Tobacco, and Firearms (ATF).
Over the course of three recorded telephone calls on March 4, 2009, the defendant and ATF agent agreed to exchange the weapons for sixty-three OxyContin pills. During these conversations, the defendant advised the agent to swab test the pills to ensure that they were real. They agreed to meet the next day, at which point the ATF agent tendered the weapons and the defendant tendered a bag of green-colored pills that the ATF agent believed to be OxyContin. The defendant was arrested. The meeting was videotaped pursuant to a search warrant.
The drugs were sent for testing to the William A. Hinton State Laboratory Institute. Dookhan was the primary analyst for all the drugs, and her signature appears on the "Assistant Analyst" line in all the drug certificates. Dookhan concluded that (1) five pills (from the first buy) contained morphine, (2) six pills (two each from the second, third, and fourth buys) contained oxycodone, (3) each pair of oxycodone pills weighed .53 grams, (4) sixty-three pills (from the final buy) contained oxycodone, and (5) the sixty-three pills weighed 16.80 grams.
The defendant was indicted on drug- and weapons-related charges to which he initially pleaded not guilty. On the first day of trial, he changed his pleas on the drug charges to guilty, without any deal or agreement with the Commonwealth. The charges to which he pleaded guilty were one charge of trafficking in oxycodone, fourteen grams or more, G. L. c. 94C, § 32E(c ) (as then in effect) (charge 4), one charge of distribution of morphine, subsequent offense, G. L. c. 94C, § 32A(b ) (charge 5), and three charges of distribution of oxycodone, subsequent offense, G. L. c. 94C, § 32A(b ) (charges 6-8). On the trafficking charge, he faced a mandatory minimum sentence of five years with a possible maximum of twenty years; on the distribution charges, he faced a mandatory minimum sentence of three years with a possible maximum of ten years. After a bench trial, the defendant was convicted of possession of a machine gun while in the commission of a felony, G. L. c. 265, § 18B (charge 1), two charges of possession of a machine gun, G. L. c. 269, § 10(c ) (charges 2-3), and possession of a silencer, G. L. c. 269, § 10A (charge 13). Sentencing on all charges occurred after the trial. The defendant received sentences of five to ten years in prison on charges 1-3, five years to five years and one day in prison on charges 4-8, and five years' probation on charge 13. All prison sentences were concurrent.
After sentencing, the defendant filed a motion for new trial seeking to withdraw his guilty pleas. He submitted an affidavit averring that (a) he did not know of Dookhan's misconduct when he entered his guilty pleas, and (b) had he known of her misconduct, he would not have pleaded guilty to the drug charges. Hearings were conducted by a special judicial magistrate and, later, a motion judge. The motion judge followed the magistrate's recommendation in denying the motion because the judge concluded the defendant failed to demonstrate a reasonable probability that, had he known of Dookhan's misconduct, he would not have pleaded guilty to the drug charges. The defendant timely appealed.
Discussion. "A motion for a new trial is the appropriate device for attacking the validity of a guilty plea." Commonwealth v. Fernandes, 390 Mass. 714, 715 (1984). "A motion for a new trial is ... committed to the sound discretion of the judge." Commonwealth v. Scott, 467 Mass. 336, 344 (2014). Therefore, we review "to determine whether the judge abused that discretion or committed a significant error of law." Commonwealth v. Resende, 475 Mass. 1, 12 (2016). See Scott, supra at 344; Commonwealth v. Antone, 90 Mass. App. Ct. 810, 814 (2017). Because the motion judge was not the plea judge, we are "in as good a position as the motion judge to assess" the record, and defer only on matters of credibility. Commonwealth v. Sylvain, 473 Mass. 832, 835 (2016), quoting from Commonwealth v. Grace, 397 Mass. 303, 307 (1986). "[I]t is plainly not an abuse of discretion simply because a reviewing court would have reached a different result," L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) ; rather, we will reverse a discretionary judgment only when the appellant demonstrates an error of law, or "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives." Ibid. (quotation omitted).
1. Legal standard. Because due process permits judges to accept guilty pleas only if they are intelligent and voluntary, see Commonwealth v. Cotto, 471 Mass. 97, 105 (2015), a defect in the intelligence or voluntariness of a guilty plea justifies its withdrawal. The defendant argues on appeal that his guilty pleas were involuntary.
Pleas can be rendered involuntary by "external circumstances or information that later comes to light," Scott, supra at 345, including information relating to misconduct by government officials. In Scott, the Supreme Judicial Court, following the United States Court of Appeals for the First Circuit in Ferrara v. United States, 456 F.3d 278, 290-297 (1st Cir. 2006), articulated a two-prong test for vacating a defendant's guilty plea in these situations. First, the defendant must show "egregious misconduct by the government that preceded the entry of the defendant's guilty plea." Antone, supra at 815. See Scott, supra at 347. Defendants are entitled to a conclusive presumption of egregious government misconduct when, as is the case here, Dookhan's signature appears on the "Assistant Analyst" line of a drug certificate that predates the defendant's guilty plea. See Scott, supra at 352; Commonwealth v. Ruffin, 475 Mass. 1003, 1004 (2016).
Second, "the defendant must demonstrate a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct." Scott, supra at 354-355. The defendant also must demonstrate that it would have been rational not to plead guilty. Id. at 356.
Although the motion judge may consider a wide range of factors, he or she may consider only "the facts and circumstances actually known to the defendant at the time of his guilty plea." Id. at 358. For example, the judge may consider existing evidence such as recordings and potential witnesses, but may not consider the possibility that the Commonwealth would retest the alleged drugs. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 357. If the defendant has demonstrated a reasonable probability that he would not have pleaded guilty had he known of Dookhan's misconduct, the denial of his motion for new trial must be reversed. See id. at 355.
2. Analysis. a. The benefit from the unagreed pleas. The analysis in this case is controlled by our recent decision in Antone, which involved a plea deal. In Antone, the court weighed the benefit of the plea bargain against the strength of what the government's case would have been in the absence of the Dookhan evidence, which can "not be used against" a defendant at trial. Antone, 90 Mass. App. Ct. at 817. Accord Scott, supra at 357 ("[A] particular case may give rise to consideration of additional relevant factors ... such as whether the defendant was indicted on additional charges and whether the drug-related charges were a minor component of an over-all plea agreement"); Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 328 (2017) (Bridgeman II ) (in Dookhan cases subject to Bridgeman II protocol, before district attorney may retry Dookhan defendant, he or she must "certify that ... the district attorney could produce evidence at a retrial, independent of Dookhan's signed drug certificate or testimony, sufficient to permit a rational jury to find beyond a reasonable doubt that the substance at issue was the controlled substance alleged in the complaint or indictment").
The defendant emphasizes the fact that he received no plea bargain. While obviously this is significant-he was promised no benefit for pleading guilty-this fact alone cannot be dispositive. Indeed, in Resende, the court affirmed the denial of a motion for new trial by a Dookhan defendant who had entered an unagreed plea. See Resende, 475 Mass. at 17-19. Still, the lack of a plea bargain is entitled to significant weight, for the benefit of unagreed pleas is far more uncertain and speculative than that of agreed pleas. The court in Resende determined that the defendant there received a lenient sentence because of the guilty pleas. Id. at 18-19. But in this case, there is no evidence in the record to support such a conclusion. Perhaps misunderstanding this, the motion judge relied on a conclusion that "[b]y pleading guilty, the defendant avoided the risk of consecutive maximum sentences on each count, which would have substantially exceeded the sentences that he received." This may reflect the judge's reading of the recommendation of the magistrate, whose findings the judge adopted, who erroneously referred to "the favorable terms of the defendant's plea agreement (i.e., concurrent five year sentences)."
But, since there was no plea agreement, he did not avoid that risk. Compare Antone, 90 Mass. App. Ct. at 819 (holding that defendant would have pleaded guilty because "the value of the evidence of Dookhan's misconduct was outweighed by the benefits of entering into a favorable plea agreement that eliminated potentially ten additional years in prison"). Since the magistrate's entire analysis here turned on what he described as the favorable terms of the nonexistent plea agreement, we conclude the judge erred in weighing this as a benefit of the plea.
The Commonwealth argues nonetheless that, even though the pleas were unagreed, they should not be disturbed because the drug charges were a "minor" part of the overall case. But the language from Scott on which the Commonwealth would rely states only what is logical: that the court should consider "whether the defendant was indicted on additional charges and whether the drug-related charges were a minor component of an over-all plea agreement." Scott, 467 Mass. at 357. As the Commonwealth acknowledges, the pleas here were not part of any overall agreement. That the pleas were unagreed, then, remains significant.
b. The strength of the Commonwealth's remaining case. The defendant was required to show a "reasonable probability" he would not have pleaded guilty had he known of Dookhan's misconduct. The Commonwealth argues that its case would have been so strong, even without the tainted certificates, that it would not have been rational for the defendant to go to trial, and that there is no reasonable probability that the defendant would not have pleaded guilty.
Obtaining the speculative, uncertain benefit of the unagreed pleas in this case would have been worthwhile only if, even in the absence of the inadmissible Dookhan certificates, the Commonwealth's case would have been an exceptionally strong one. Thus, for example, in Resende, where the court affirmed the denial of the motion to withdraw unagreed pleas, four certificates of analysis relating to different samples had been entered in evidence, and only one of them was signed by Dookhan, and with respect to the sample tested by Dookhan, there had been a positive field test for cocaine. See Resende, 475 Mass. at 17-18 (police detective "conducted five controlled buys, each of which involved a hand-to-hand exchange of cash for two 'twenty bags' or one 'forty' bag of an off-white rock-like substance. Not only could a rational jury have inferred that [the detective] received what he had requested from the defendant, but field tests conducted on the substances indicated the presumptive presence of cocaine .... [Given] the fact that all but one of the drug certificates were signed by chemists other than Dookhan, evidence of her misconduct would not have detracted from the factual bases supporting the defendant's guilty pleas").
As described above, the magistrate's entire analysis relied on his erroneous belief that there had been a favorable plea agreement. But even if that error alone would not require reversal, what remained of the Commonwealth's case here was much weaker than in Resende. And, although, on this side of the scale the motion judge asserted that "[t]he defendant has not suggested any viable defense that he would have pursued had he not [pleaded] guilty"-which is what the magistrate said-in the absence of the evidence contained in the drug certificates of the weighing and testing of the drugs, an argument to the jury that the evidence is too weak to support a conviction might well be a sufficiently viable defense to create a reasonable probability that the defendant would have chosen trial over an unagreed plea.
(i) Trafficking charge and the pills' weight. We address first the most serious charge, that of trafficking. The substance and weight are both elements of this offense. Dookhan's drug certificate identifies the substance (oxycodone) contained in, and the total weight (16.80 grams) of, the sixty-three pills.
The drug certificate is the only evidence of the pills' weight, and it indicates that the weight is only 2.80 grams above the statutory minimum-approximately the weight of a penny. This difference suggests that a fact finder could not determine beyond a reasonable doubt, without scientific testing, that the pills weighed at least fourteen grams. See Commonwealth v. Francis, 474 Mass. 816, 827-828 (2016) (jury could not determine, without scientific testing, that cocaine allegedly weighing 38.7 grams exceeded twenty-eight gram threshold). In the absence of the drug certificate there is no other evidence of the pills' weight, which the Commonwealth concedes, and thus a reasonable probability that the defendant would not have pleaded guilty to the trafficking count, with its five-year mandatory minimum sentence. The fact that all the Dookhan-signed certificates indicate roughly (although, significantly, not exactly) the same per-pill weight is irrelevant, since all were signed by Dookhan. The defendant has met his burden of showing a "reasonable probability" he would not have pleaded guilty to this charge had he known the drug certificates were inadmissible.
The Commonwealth argues that there is no evidence that Dookhan tampered with drugs in tablet form. This is part of what led the magistrate to conclude, in a finding adopted by the judge, that "any perceived weaknesses in the Commonwealth's case resulting from Dookhan's participation in the testing of the underlying substances would have been minimal." The magistrate concluded that "the fact that the drugs were in pill form diminishes the probability of Dookhan's misconduct."[5]
While the Commonwealth likewise couches its argument as one that the prejudice to the defendant is "greatly diminished" because the drugs were in tablet form, to even reach the question would require us to ignore the Supreme Judicial Court's admonition that certificates signed by Dookhan as assistant analyst are subject to a conclusive presumption of egregious governmental misconduct, regardless of the substance in question. See Scott, 467 Mass. at 354. These certificates are inadmissible, see Antone, supra at 817, and the Commonwealth does not suggest that there is any other basis (aside from "eyeballing" the pills, see supra ) on which the jury could have found a weight over fourteen grams. The magistrate, and the judge who adopted his findings, thus miscalculated the strength of the Commonwealth's case in the absence of the certificates.
Given this, we think the judge's conclusion that the defendant failed to demonstrate a reasonable probability that because of the lack of other evidence of weight, which is essential to a trafficking charge, he would not have pleaded guilty to the trafficking charge had he known of Dookhan's misconduct, represents "a clear error of judgment in weighing the factors relevant to the decision such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. at 185 n.27 (quotation omitted).
The Commonwealth does not suggest it could have reweighed the pills, nor could it make such an assertion in a case like this. "[I]n assessing the likelihood of whether the defendant would have tendered a guilty plea, a judge may not consider any assertion by the Commonwealth that it would have offered to retest the substances at issue in the defendant's case if the defendant had known of Dookhan's misconduct. The reasonable probability analysis must be based on the actual facts and circumstances surrounding the defendant's decision at the time of the guilty plea in light of the one hypothetical question of what the defendant reasonably may have done if he had known of Dookhan's misconduct. To permit further hypothetical arguments to factor into the analysis, such as the results of any retesting the Commonwealth might have offered to undertake, would require a court to heap inference upon inference and will bring the inquiry under this prong too far afield of the facts and circumstances actually known to the defendant at the time of his guilty plea." Scott, supra at 357-358.
(ii) Charges 4, 6, 7, and 8, and the contents of the alleged oxycodone pills. The Commonwealth also would have needed to prove beyond a reasonable doubt that the pills that formed the basis for the charges of trafficking in and distribution of oxycodone in charges 4, 6, 7, and 8 contained oxycodone and were not counterfeits. As we explained in Antone, supra at 817, although the defendant would have been warranted in concluding the certificates could not be admitted against him, we do not ignore the other evidence with respect to the fact asserted in the certificates-here the composition of the substance.
The drug certificates were not the only evidence of this fact. According to the DEA agent, the agent conducted three controlled buys at which the defendant claimed to be selling OxyContin. Also, according to the DEA agent, the defendant identified his supplier, to both the DEA agent and one of the confidential informants, as an eighty year old woman with a prescription who had recently been robbed, and thrice drove the DEA agent to her residence. The police also had a record of that person's house as one that had been robbed of OxyContin. Finally, the defendant was recorded several times claiming to the ATF agent that the pills contained oxycodone, and he urged the ATF agent to test the sixty-three pills.[6]
To take the last evidence first, an alleged drug dealer's statements that his drugs are real is worth little, especially where the Commonwealth acknowledges the defendant had previously sold a counterfeit or inoperative hand grenade. To be sure, there could be grievous consequences for selling fake drugs-in this case to a person with access to weaponry including machine guns-but any sale of fake drugs carries substantial risks of retaliatory physical violence. Strong assertions that the drugs are real is something, but with this as the primary evidence of the composition of the pills, the Commonwealth's case would have been much, much weaker without the drug certificates. The statements about the supplier, corroborated to some degree by the evidence that she was robbed of OxyContin, add more to the Commonwealth's case. But there was no evidence of the prescription or the bottle, and the evidence had to prove the composition of these pills beyond a reasonable doubt. Cf. Commonwealth v. Alisha A., 56 Mass. App. Ct. 311, 313-314 (2002) ("The jury reasonably could have inferred that the distributed substance was Klonopin" even in the absence of a certificate, from, inter alia, "the juvenile's statements ... that she would be bringing Klonopin pills into school and distributing them to others, and that they were in her home by prescription, a fact confirmed by the juvenile's mother, who testified that she had discovered seventeen pills missing that day. The juvenile's display of pills and a prescription bottle to ... other students the next day also supports the conclusion that the juvenile carried out her stated intention." [Footnote omitted] ). Perhaps the Commonwealth could have marshaled some additional evidence, but again, as Scott instructs, "To permit further hypothetical arguments to factor into the analysis ... would require a court to heap inference upon inference and will bring the inquiry under this prong too far afield of the facts and circumstances actually known to the defendant at the time of his guilty plea." Scott, supra at 357-358.
While the Commonwealth had some case to present on the content of the pills, it was far weaker than one featuring certificates of analysis. The magistrate's conclusion, and thus the judge's, was infected by the same error in weighing the strength of the case without the certificates. Given the speculative nature of the benefit from an unagreed plea, we think the defendant has met his burden to demonstrate all he must: that with respect to the relevant charges, in the absence of the drug certificates, there would have been a "reasonable probability" he would not have entered the unagreed plea. Contrast Antone, supra at 818 (the Commonwealth had "significant additional evidence" the substance was cocaine-a different chemist had performed primary testing and identified the substances as cocaine; two controlled buys had been conducted, of substances that field-tested positive for cocaine; a room in the defendant's house had "all the requisite supplies, tools, and instruments specific to cooking, processing, and packaging cocaine for distribution; the defendant pointed out the 'drugs' to the police; and an experienced detective, based on his training and experience, was potentially available to testify"). With its clear errors in assigning weight to both the value of the pleas to the defendant, and the strength of the Commonwealth's case without the certificates, the judge's conclusion to the contrary was outside the range of his sound discretion.
(iii) Charge 5 and the contents of the alleged morphine pills. Finally, the only direct evidence that the pills related to the charge of distribution of morphine contained morphine is Dookhan's drug certificate. There is no circumstantial evidence supporting that conclusion. There were no recorded conversations between the defendant and the confidential informant who conducted the controlled buy, and there is nothing in the record about the source of the morphine. Indeed, the Commonwealth raises no independent argument about the contents of the pills alleged to be morphine. Again, weighing the factors properly, the defendant has demonstrated a reasonable probability he would not have pleaded guilty had he been aware of Dookhan's misconduct, and for the reasons spelled out above, the judge's conclusion to the contrary must be reversed.
Order denying motion for new trial reversed.

See Commonwealth v. Scott, 467 Mass. 344, 349-350 (2014) (describing Dookhan's misconduct).

For ease of expression, we treat the special judicial magistrate's findings of fact and conclusions of law as findings and conclusions of the motion judge, the latter having adopted them.

The record is unclear whether the defendant was buying pills from the woman or had robbed her.

The magistrate also relied, in determining the strength of the Commonwealth's remaining case, on the admissibility of the second analyst's "confirmatory analysis, the integrity of which is not in doubt." The Commonwealth does not rely on the confirmatory analysis, presumably because there is, in fact, nothing in the record indicating whether or not the confirmatory analysis was reliable and independent of Dookhan's tests. Compare Antone, 90 Mass. App. Ct. at 816-817 (affidavit of another analyst showing that she "performed at least two tests that indicated the substances were consistent with cocaine and that her role in testing and storing the substances was entirely independent of the testing done by Dookhan" important to defendant's decision to plead guilty).

The Commonwealth also would rely on the ATF agent, who was familiar with oxycodone, recognizing the pills as oxycodone, but where the issue is whether the pills are or are not genuine, this adds little to the Commonwealth's side of the scale.